FILED

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

97 MAY 14 PM 12: 07
U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| SOUTHERN HAULERS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 95-G-2612-S |
| ) | |
| KENWORTH OF ATLANTA, INC.; ) | |
| BUDDY HARRELL, ) | |
| ) | |
| Defendants. ) | |

ENTERED
MAY 14 1997

## MEMORANDUM OPINION

This cause is before the court upon the motion of defendants for summary judgement. The parties have submitted briefs and evidentiary material, and the motion is now ready for ruling.

### FACTUAL SUMMARY

This action arises out of the sale by Kenworth of Atlanta, Inc. ("KWA"), through its salesman Buddy Harrell, of five tandem axle dump trucks to the plaintiff. The plaintiff, Southern Haulers, Inc. ("Southern Haulers"), is a small, closely held, corporation engaged in the business of providing short haul transportation of bulk materials, such as sand and coal, to industries throughout Alabama. The company was founded by Dick

Edwards in 1962. His wife, Loretta Edwards, joined the business in 1969 and ran the accounting and bookkeeping department, and eventually took on the additional duty of payroll clerk. The company grew over the years into a fleet of more than 75 trucks. Throughout its growth, Dick Edwards was involved in virtually every decision made by the company, especially in the area of equipment purchases.

In 1992, Mr. Edwards suffered a debilitating stroke, which thrust Mrs. Edwards into the position of president of the company. The only other executive officer of the company was its vice president, George Roberts. Mr. Roberts' expertise is in the area of marketing the company's transport services. Prior to Mr. Edwards' stroke, the company was operated with the financial expertise of Mrs. Edwards, the marketing abilities of Mr. Roberts, and the technical know-how of Mr. Edwards.

In early 1993, Mr. Roberts saw the need to add additional trucks to Southern Haulers' fleet. Mr. Roberts sought a bid from Don Meeks, a salesman with Kenworth of Birmingham ("KWB"). During this same period of time, Mrs. Edwards was contacted by Mr. Harrell, who was then a salesman with KWA. Mr. Harrell had more than 25 years experience in the trucking industry, and had previously sold trucks to Mr. Edwards. Mrs. Edwards invited Mr. Harrell to bid on the trucks Southern Haulers had decided to purchase.

Shortly after the bids were solicited, KWA and KWB each submitted detailed specifications and price quotes for the trucks. The specifications for the trucks were quite similar, with one notable exception—the KWB specifications called for a 20,000 pound front axle,[1] while the KWA specifications called for a 12,000 pound front axle. The KWA bid was also lower. Mr. Roberts could not figure out why there was such a discrepancy in the bid amounts and sought the advice of Mr. Meeks, a salesman for KWB.[2] Meeks told Mr. Roberts that the 12,000 pound axle was insufficient for Southern Haulers' needs. Mr. Roberts then contacted Harrell and asked him to re-evaluate the specifications submitted by KWA, specifically in regard to the front axle. Mr. Harrell replied by upping the size of the front axle to 14,600 pounds and, according to Mr. Roberts, assured him "that the truck specified by Kenworth of Atlanta, with a 14,600 pound axle could do the job required by Southern Haulers." (Roberts Affidavit, ¶6). Sometime after the trucks were received by Southern Haulers, it is alleged that problems became evident.

---

[1] Although this assertion was not contradicted by the defendants, the court notes that what appears to be the bid from KWB is attached as Defendant's Exhibit # 21 to the deposition of Lorretta Edwards. That document seems to specify a 12,000 pound axle.

[2] It should be noted that Southern Haulers' first contact regarding the bids was with the KWB salesman. This is clear evidence that no special relationship existed between Harrell and the plaintiff.

>The trucks, when loaded with a typical load, appeared to be close to collapse and numerous problems began to develop with abnormal and excessive tire wear.  Through consultation with the service department at KWB[3] and a number of tire dealerships and front-end alignment shops, Mr Roberts was able to discover that Harrell and KWA had under-specified the front axle on the trucks and that the axles, as they existed, despite Harrell's representations to the contrary, were not capable of meeting the hauling requirements of Southern Haulers and its customers.

(Plaintiff's brief at pp. 5-6)

<u>PLAINTIFF'S CLAIMS</u>

In its complaint, Southern Haulers sets forth causes of action for "breach of contract, fraud in the inducement, negligent misrepresentation, breach of express warranties, breach of the implied warranty of fitness for a particular purpose and revocation of acceptance."[4]  Plaintiff's claims, whether based in fraud or contract, essentially arise from its allegation that

---

[3]  Again it must be noted that Southern Haulers sought out the expertise of KWB and not Harrell or KWA on this matter.

[4]  This summary of plaintiff's claims comes from its brief of February 10, 1997.  The plaintiff's complaint also contains claims based upon the Magnuson-Moss Warranty Act and the Alabama Motor Vehicle Franchise Act.  Those claims are not addressed by the plaintiff's opposition to the motion for summary judgment and it has presumably abandoned those claims.  Neither of these Acts applies to the sale in question.  In any event, the plaintiff has not supported those claims by affidavit or otherwise and summary judgment is due to be entered in favor of the defendants on those claims.

4

Harrell represented that the trucks would "do the job." Southern Haulers alleges that the trucks did not "do the job" required of them.

Important to a proper analysis of this case is a recognition of what plaintiff does not claim. Southern Haulers does not claim that the trucks as delivered were not as they were specified—except for the fact that they would not "do the job." Nor does it claim the defendants represented that the front axle was other than a 14,600 pound axle. The plaintiff also does not claim to have been misled specifically as to the maximum weight the trucks could carry—its only claim being that the maximum weight the truck could in fact carry was insufficient to "do the job."

<u>PLAINTIFF'S FRAUD CLAIMS</u>

I.

MISREPRESENTATION

Southern Haulers claims that the defendants are guilty of fraud by representing that the trucks specified in the sales agreement would "do the job," when in fact they would not. The plaintiff claims it relied upon this representation and purchased the trucks to its detriment.

No matter how plaintiff attempts to characterize this as a misrepresentation of a present fact, it is clearly an

5

expression of opinion about a future fact. The plaintiff has not offered any evidence of a misrepresentation by defendants of a presently existing fact. The defendants submitted a detailed set of specifications that the trucks would have and Southern Haulers has not suggested that any of the specifications were not met.[5] In fact, the only specific discussion of the trucks' specifications in the record is the one between Mr. Roberts and Mr. Harrell. This conversation is reported by Mr. Roberts as follows:

> The bids were very similar, but the Kenworth of Atlanta bid was several thousand dollars less than the bid from Kenworth of Birmingham. Interested in the reason for this lower bid, I contacted Mr. Meeks [the KWB salesman] and asked him to review the bids and explain why the price submitted by Kenworth of Birmingham was so much higher. He pointed out that the bid submitted by Kenworth of Atlanta included only a 12,000 pound front axle, while the bid from Kenworth of Birmingham provided for a 20,000 pound front axle. Mr. Meeks told me that the 12,000 pound front axle would be insufficient for Southern Haulers' needs. I contacted Mr. Harrell at Kenworth of Atlanta and voiced my concern that the 12,000 pound front axle was insufficient for our needs. He disagreed, but said he would increase the front axle size to 14,600 pounds just to be sure. After further conversation, Mr. Harrell assured me that the truck specified by Kenworth of Atlanta, with a 14,600 pound axle could do the job required by Southern Haulers.

(Affidavit of George Roberts, ¶6). Conspicuously absent is any mention by Mr. Roberts of the "job" Southern Haulers required the

---

[5] It is important to note that the trucks were built to order <u>after</u> the contract for sale had been agreed to. Also, Southern Haulers arranged for the installation of the dump bodies by a vendor other than KWA. Therefore, representations about the performance of the trucks would necessarily involve future facts.

6

trucks to do. In fact, nowhere in the record is there an indication that anyone at Southern Haulers revealed to the defendants the particular job they wished the trucks to do. They did not reveal they wished to haul the maximum legal load, and there is no indication they suggested Harrell should review their operation to determine their specific needs.[6]

This account also clearly shows that Southern Haulers was on notice as to the weight limit of the front axles specified by KWA. It could have, at this point, specified a 20,000 pound axle, but knowingly accepted a 14,600 pound axle. Since Southern Haulers was concerned that the 12,000 pound axle initially specified by KWA was insufficient "to do the job," it should have at least informed KWA of the job required.[7]

The above transaction does not constitute actionable fraud by the defendants.

---

[6] It is especially important to note that none of the previous trucks Harrell sold to Southern Haulers had a front axle rating greater than 12,000 pounds and none were tandem dump trucks. This is confirmed by the depositions of both Mrs. Edwards and Mr. Harrell.

[7] Again, it is especially noteworthy that Southern Haulers consulted the salesman at KWB about the discrepancies in the bids and only asked KWA about the axle size after being alerted to the possibility that they were too small by the KWB salesman. This conclusively establishes that Southern Haulers was not relying exclusively on the expertise of KWA to determine the specifications of the trucks ordered. The only normal interpretation of the discussion between Roberts and the two competing Kenworth dealers is that Southern Haulers, in an arms length transaction, sought the best price for the trucks it desired.

> To recover under either the willful, reckless, or innocent species of legal fraud, the plaintiff must establish the following elements: 1) a false representation; 2) the false representation must concern a material, <u>existing fact</u>; 3) the plaintiff must rely upon the false representation; and 4) the plaintiff must be damaged as a proximate result.

<u>Jones v. McGuffin</u>, 454 So.2d 509, 511-12 (Ala. 1984)(emphasis added). Furthermore, "[i]t is axiomatic that mere statements of opinion are not material facts upon which actions for legal fraud can be maintained." <u>McGuffin</u> at 512. The representation, if in fact it was made, upon which plaintiff bases its fraud claims constitutes, as a matter of law, the expression of an opinion. Clearly a representation that the trucks would "do the job" constitutes a subjective opinion about capability of the trucks. Therefore, plaintiff's claims for fraud based upon the alleged misrepresentation must fail.

Even if the alleged statements were not expressions of opinion, plaintiff's fraud claim amounts to representations about future acts. A representation that the trucks would "do the job" is nothing more than a promise that they would.[8] Since the trucks had not been manufactured at the time the representations were allegedly made, the representation clearly amounted to a promise to deliver trucks that would do the job. The law on

---

[8] A different conclusion might result if it were alleged by Southern Haulers that Harrell represented that a 14,600 pound axle would allow them to carry the maximum legal load without the use of flotation tires. There is, however, no such allegation.

8

promissory fraud in Alabama is well settled and is related to the rule concerning opinions. "As to promises (or opinions) there must have been at the time an intention not to do the act promised (an existing status) and that it was made with the intent to deceive." Birmingham Broadcasting Co. v. Bell, 68 So.2d 314, 321 (Ala. 1953). It is equally well settled that the mere failure to perform the promised act alone is not evidence of an intention not to perform the act at the time the promise was made. See, eg., Brock v. Brock, 8 So. 11, 14 (Ala. 1890)("If there was such a verbal promise, the subsequent failure to observe it was a mere breach of contract....").

Related to the concepts of opinion and promissory fraud is the exception, in a sales context, for statements that amount to "puffing." The alleged statements of Harrell also fall into this exception to the general rule on misrepresentations. In Pell City Wood v. Forke Bros. Auctioneers, 474 So.2d 694 (Ala 1985), the court was faced with an allegation of fraud similar to that in the instant case. In that case an auctioneer made statements about the condition of trucks being sold. The court concluded not only that they did not constitute fraud, but further held them insufficient to give rise to an express warranty.

> The statements of the auctioneer that "the trucks are in good condition," and "the trucks are ready to work tomorrow" are clearly an example of "puffing" on the part of the auctioneer in an attempt to get more money at sale. Even if they are not classified as

9

> "puffing," at best these statements are simply the auctioneer's opinion or commendation of the trucks which ... do not rise to the level of an express warranty.

474 So.2d at 695. These statements are very similar to those alleged to have been made by Harrell. Any statement by Harrell that the trucks would "do the job" constitutes, as a matter of law, nothing more than "puffing" sales talk and no reasonable buyer could construe them otherwise.

Therefore, for each of these three reasons, plaintiff has failed to introduce a genuine issue for trial as to its misrepresentation claims. Defendants are entitled to a judgment as a matter of law on plaintiff's misrepresentation claims.

## II.

## SUPPRESSION

The plaintiff also claims that the defendants are guilty of fraud through suppression. Its argument as set forth in its brief is as follows:

> Even Harrell had to admit in his deposition that he was aware Southern Haulers was relying on his judgment. (Harrell depo., p. 102).[9] Harrell knew that his state

---

[9] The deposition exchange is a follows:

Q: Do you feel that Southern Haulers in 1993 without Dick Edwards available was looking to you for your expertise in specing out a truck?

A: I think they were partially, yeah.

(continued...)

10

> ments, or for that matter, his silence, would affect the decisions made by Southern Haulers. Nevertheless, Harrell did not bother to point out, under the defendants' own technical reasoning, that Southern Haulers could only carry the weight it desired with the use of flotation tires.
>
> * * * *
>
> Harrell's suppression of the material facts surrounding the functional capabilities of the front axle, even upon being directly asked about the axle's ability to perform the job required by Southern Haulers,[10] induced Southern Haulers to act to its detriment.

(Plaintiff's brief at p. 13).

The law of suppression of material facts is codified at Ala. Code § 6-5-102:

> Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case.

The plaintiff has introduced no evidence tending to show that any special relationship existed between Harrell and Southern Haulers that would give rise to an obligation to disclose the facts allegedly suppressed. Southern Haulers did not employ Harrell as a consultant to advise them as to the specifications of the

---

[9](...continued)
Q: When you say partially, what's the qualification?

A: <u>They told us what they wanted</u> and I guess everybody that bid on it was told the same thing.

(Harrell depo. at 102)(emphasis added).

[10] As has been previously noted, Southern Haulers never told Harrell what "job" they required the trucks to perform.

11

trucks it wished to purchased. Harrell was nothing more than a truck salesman submitting a bid for the trucks Southern Haulers required. There is nothing in the record to indicate that any special or confidential relationship existed. In fact, the record contains evidence to the contrary. Southern Haulers solicited competitive bids from both KWA and KWB. In fact, when Roberts noticed the price difference in the bids, he went not to Harrell but to the salesman at KWB for an explanation. This is clear evidence that Southern Haulers was not relying on any special relationship with Harrell. There is no evidence in the record to indicate that Southern Haulers' relationship with Harrell was any different than its relationship with Mr. Meeks, the KWB salesman. Though Mrs. Edwards and Mr. Roberts insist that they were relying on Mr. Harrell's unique appreciation of Southern Haulers' needs, there in nothing in the record that tends to indicate this reliance was conveyed to Harrell. There is no evidence a special relationship existed and, therefore, no issue for trial as to that issue.

Even if such a relationship existed, Southern Haulers' claims based upon suppression would fail. In <u>Kaye v. Pawnee Const. Co., Inc.</u>, 680 F.2d 1360 (11th Cir. 1982) the Eleventh Circuit Court of Appeals went into some detail in setting forth the elements necessary to prevail on a suppression claim.

> [F]raudulent concealment is defined to be, "the failure to disclose a material fact, which the vendor knows himself, which he has a right to presume the

person with whom he is dealing is ignorant of, <u>and of
the existence of which the other can not, by ordinary
diligence, become acquainted.</u>" <u>Concealment implies
design, or purpose</u>. That it may furnish a sufficient
cause of action, the fact suppressed must not be only
material, but the materiality must either be known to
the seller, or the facts must so constitute an element
of the value of the contract, as to authorize the
inference of knowledge of its materiality. <u>The
concealment must be for the purpose of continuing a
false impression or delusion under which the purchaser
has fallen, or of suppressing inquiry</u>, and thereby
effecting a sale—with the intention to conceal or
suppress—and it must operate an [sic] inducement to the
contract.

\* \* \* \*

<u>When the means and sources are equally accessible
to both parties, the ignorance of the purchaser is
regarded as self-deception, unless art or artifice is
employed to prevent investigation</u>, or stifle
information. But, when the access to information is
not equal, as when it rests in the personal knowledge
of individuals unknown, or exclusively in the knowledge
of the seller, the concealment of a known material
fact, though without art or artifice, if willful or
intentional, is, on the same principle as a
misrepresentation not known to be false, sufficient to
sustain a right of action.

680 F.2d 1370-71 (quoting <u>Marshall v. Crocker</u>, 387 So.2d 176, 179 (Ala. 1980)(emphasis added). This rule is of long-standing application.[11]

In this case there is no evidence of any actual intent to conceal or suppress material facts on the part of the defendants. Additionally, there is no evidence tending to indicate that the facts alleged to have been concealed were not

---

[11] The Alabama Supreme Court in <u>Marshall</u> was quoting from <u>Jordan & Sons v. Pickett</u>, 78 Ala. 131 (1884).

equally accessible to both parties to the sales transaction. Southern Haulers clearly had access to information about the load capacities of the axles specified and to information about flotation tires.[12]  Although Southern Haulers, has attempted to portray itself as having virtually no knowledge of trucks or their hauling capacity (a frightening prospect for a trucking company with more than 75 trucks on the road), it must again be noted that Southern Haulers was responsible for having the dump bodies attached to the trucks.

      Southern Haulers in effect seeks to have this court impose a quasi-fiduciary duty upon a truck salesman who submitted one of several bids solicited by Southern Haulers from competing truck salesmen.  There is no evidence to support the finding of a confidential or other special relationship, nor is there any evidence tending to show that any alleged failure to disclose was done intentionally with an intent to deceive or under circumstances where information was uniquely available to the seller.  Therefore, the defendants are entitled to judgment as a

---

[12]  It is interesting to note that the particular suppression Southern Haulers complains about, that flotation tires would be required to meet Southern Haulers' needs, was an issue that was contemplated by the parties.  The undisputed evidence in the record demonstrates that flotation tires would be required to achieve the load capacities Southern Haulers now claims it desired.  It is also undisputed that Southern Haulers refused to use flotation tires and communicated that decision to Harrell prior to the time he submitted his bid.  To now claim that Harrell suppressed the fact that flotation tires would be required ignores this prior communication of Southern Haulers' unwillingness to use flotation tires.

matter of law on plaintiff's suppression claims, there being no genuine issue for trial as to those claims.

## PLAINTIFF'S CONTRACT CLAIMS

Southern Haulers claims that the defendants breached both express and implied warranties based upon the alleged representation by Harrell that the trucks would "do the job." Both of these warranty claims are governed by the applicable provisions of the Uniform Commercial Code as adopted in Alabama.

Section 7-2-313 provides as follows:

> 1) Express warranties by the seller are created as follows:
>
> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
>
> \* \* \* \*
>
> (2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, <u>but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty</u>.

(Ala. Code 1975)(emphasis added). In light of subsection two, the statement attributed to Harrell that the trucks would "do the job," does not create an express warranty. It constitutes

15

nothing more than the "seller's opinion or commendation of the goods." If it were alleged that Harrell had said that the trucks would haul a specific weight, a different conclusion might be reached.

Southern Hauler's also alleges that an implied warranty of fitness for a particular purpose was created. Section 7-2-315 governs the creation of such warranties and provides as follows:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under Section 7-2-316 an implied warranty that the goods shall be fit for such purpose.

Ala. Code (1975).

Southern Haulers argues that Harrell knew of the use to which the trucks would be put, knew of its reliance on Harrell's judgment to furnish suitable trucks, and failed to deliver trucks fit for that purpose. In spite of Southern Haulers' repeated assertion that it was relying on Harrell's expertise, there is nothing in the record to indicate that the extent of that alleged reliance was communicated to Harrell. There is no evidence in the record to show that Harrell was told with any detail of the specific needs of Southern Haulers. The record is full of statements by Mrs. Edwards and Mr. Roberts to the effect that they were relying on the expertise of Harrell. However, there is no indication this reliance—if in fact it existed—was communicated to Harrell.

Also, there is evidence that belies Southern Haulers' assertion of exclusive reliance on Harrell. Harrell submitted a bid on the trucks only after learning of a prior solicitation from KWB. Additionally, when Roberts noticed a difference in price between the competing bids, he contacted Mr. Meeks at KWB and not Harrell.

Knowledge on the part of Harrell of the particular use to which trucks were to be put is a necessary element of any warranty of fitness for a particular purpose. As discussed above, there is no evidence that Southern Haulers revealed its desire for trucks that would be able to haul the maximum legal load. In fact, its specification of highway tires—as opposed to flotation tires—negates any implication to that effect that might have otherwise arisen. Without evidence of knowledge on the part of Harrell of the particular use the trucks would be put or evidence that Harrell was aware that Southern Haulers was relying on his expertise, no warranty of fitness for a particular purpose exists.

Even if either express or implied warranties arose based upon the alleged oral assurances of Mr. Harrell, they were excluded by the subsequent written memoranda. Section 7-2-316 sets forth the requirements for an effective exclusion or modification of warranties and provides in pertinent part as follows:

17

> 1) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this article on parol or extrinsic evidence (Section 7-2-202) negation or limitation is inoperative to the extent that such construction is unreasonable.
>
> (2) [T]o exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

(Ala. Code 1975). Section 7-2-202 provides in pertinent part as follows:

> Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement. . . .

(Ala. Code 1975).

The acceptance document for the trucks was signed by Mrs. Edwards on July 2, 1993. That document contains the following language immediately above Mrs. Edwards' signature:

### DISCLAIMER OF WARRANTIES

> This seller, Kenworth of Atlanta, Inc. hereby expressly disclaims all Warranties either Expressed or implied, including any implied Warranty of Merchantability of Fitness for a particular purpose and Kenworth of Atlanta, Inc. neither assumes nor authorizes any other person to assume for it any Liability in connection with the sale of the vehicle or vehicles.
>
> USED TRUCKS ARE SOLD "AS IS WITH NO WARRANTY EXPRESSED OR IMPLIED."

> Any exceptions to the above will be noted on this document.
>
> I HAVE READ THE ABOVE AND ACKNOWLEDGE RECEIPT OF THE ABOVE VEHICLE OR VEHICLES.
>
> PURCHASER [Signature of Lorretta Edwards]

(Defendant's Exhibit # 25 to the deposition of Lorretta Edwards). The above language is conspicuous and located immediately above Mrs. Edwards signature. There are no "exceptions" noted on the face of the document.

Similar exclusionary language is included in each "Security Agreement (Conditional Sale Contract)" signed by Lorretta Edwards. (Copies are attached as "Defendant's Exhibit # 27 to the deposition of Lorretta Edwards.) In addition to language excluding any express or implied warranties, the agreement also provides on its face, just above Mrs. Edwards' signature, as follows:

> ADDITIONAL COVENANTS AND ORAL AGREEMENT: THIS AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

The above disclaimers signed by Mrs. Edwards, operate to exclude any express or implied warranties founded upon the alleged oral representations of Mr. Harrell. These writings clearly exclude any implied warranty of fitness for a particular purpose. The language on the order conformation that "[a]ny exceptions to the above will be noted on this document" removes

any doubt the writing was intended to operate as the final expression of the parties agreement with respect to warranties, whether express or implied. The language contained in the security agreements is even clearer. That language leaves no doubt that it is the final agreement of the parties as to warranties. Therefore, section 7-2-202 prohibits the introduction of prior oral warranties, whether express or implied. For these reasons, plaintiff's warranty claims must fail.

Because the alleged additional warranties are not part of the contract, Southern Haulers' claims for breach of contract and revocation of acceptance based upon those terms must also fail. There is no evidence the trucks delivered differed in the smallest detail from those specified. In short, Southern Haulers got exactly what they bargained for.

CONCLUSION

No genuine issue of fact exists as to any of plaintiff's claims and the defendants are entitled to a judgment as a matter of law. Therefore, by separate order the court will enter judgment in favor of the defendants as to all of plaintiff's claims.

DONE this 14th day of May 1997.

UNITED STATES DISTRICT JUDGE
J. FOY GUIN, JR.